Good morning. May it please the Court. My name is Erwin Chemerinsky and I represent the Plaintiff's Appellants. This is a case where the trial court abused its discretion by failing to make minimal factual findings about crucial issues that likely determine the outcome of the case. This is a trial that ultimately came down to the credibility of two witnesses with conflicting stories, Plaintiff Miguel Lopez and Defendant Officer Tommy Thompson. The trial court's ruling undermined the credibility of the Plaintiff by requiring that he sit in an isolated section of the courtroom with two armed guards near him. Could you describe that more precisely? I was a little unclear on exactly what the architecture of all this was. Yes, Judge. In the Central District of California, the courtroom has three sections of spectators, unlike the two that are here. And the Plaintiff, Miguel Lopez, was required to sit by himself in one section of the courtroom. So it's not just a bride's side and a groom's side. It's three groups of witnesses. That's correct. That's exactly right, Your Honor. What's so out of it by sitting in the center section of the Central District courtroom in the front row? What's isolating about that? That's a, you know, prime ticket spot. Well, that's not exactly what happened, Your Honor. There was nobody else in his section of the third of the courtroom. He was by himself. The other parties, the lawyers, were all someplace else. In addition, he had an armed guard next to him at all times, another armed guard either standing behind him or at the side. Were the other defendants seated next to their, or not defendants, plaintiffs, seated next to their lawyers? The other plaintiffs were in the center section, whereas he was in a side section by himself. So nobody was sitting with their lawyer? No. The lawyers were at counsel table. But the other plaintiffs were in a section where there were many other spectators in the courtroom. And he was by himself. I had a couple things I was trying to find out concretely. One is I usually sat next to my client when I represented a plaintiff. But I gather in this case the clients were not sitting next to their lawyers at the counsel table. So my understanding is they were sitting in the center section. He was sitting in the side section. Were they sitting at the counsel table or in the benches behind the bar? No, no. They were sitting on the benches behind. Behind the bar. That's correct. Now, were the other plaintiffs sitting right behind the counsel table so they could whisper to their lawyers and the lawyers could whisper to them, or were they more separated from them? I don't know. I mean, I know they're sitting up front. In terms of whether they could actually whisper to counsel, I don't know. But I have trial counsel here, and I could certainly find that out. The key, of course, here is that Miguel Lopez was by himself and armed guard by him at all times. Now he was by himself by choice because the option was you can sit at counsel table with a guard nearby, or you can sit in the center section, front row, with a row between you and spectators, or you can sit in the side front row with a cushion row in between Lopez and spectators. So if he were seated, as to which there's nothing in the record, if he were seated to the side, that's his choice. No, it was the judge's order. But the key, Your Honor, is no, it wasn't the judge's order. I just said what the judge's order was. The judge's order was you can sit at counsel table with a guard nearby, or you can sit in the center section next to a guard, or you can sit on the side section next to a guard in either of the latter two cases with a row between Lopez and the spectators. The key, Your Honor, is that the armed guard was next to him at all times. This Court has recognized that. Okay. So the key is not where he was sitting. The key is that he had an armed guard by or near him. Right? I mean, is that right? I think the armed guard is sufficient here. I do think it's relevant where he was sitting. But the key is that this Court has recognized that. Are you giving up the argument, then, that he was forced to sit isolated at the side?  My point is that what occurred at the time was that the armed guard was sitting  I'm asking the point you made. You said he was forced to sit isolated at the side of the courtroom with nobody around him. He was forced to do that, and that's very prejudicial. That's your point. Are you giving up that point? It's a very simple question, counsel. Do you give up that point? No, Your Honor, I don't. All right. Well, then, what do you do with the fact that counsel says he's not allowed to sit at counsel table, and the Court says that's not true? He is allowed to sit at counsel table. I just said that he sits there. He has to have a guard nearby. He doesn't even have to be at the counsel table. What do you do with that? Your Honor, my point here is that it's the arm, it's the choice that you make. That's not the point you made before. I'm asking are you giving up that other point? Yes. I will focus so I can go forward in the argument on the fact that the armed guard was next to him at all times. The only point is that an armed guard was close to him at all times. Is that correct? Yes, Your Honor. An armed guard's presence next to him at all times is recognized by the Supreme Court, and this Court is highly prejudicial. Was it just one, or was it a phalanx? Well, the record says in several places I can give you the pages that there were guards next to him. I had the impression that sometimes he might have had one on either side of him, sometimes he might have had two next to him, and sometimes he might have had one next to him. The way it's been described to me is there's always one guard next to him, another guard in the courtroom. I carefully looked at the record. We're talking about the record, not what was described to you. Yes, Your Honor. What does the record show with respect to that? Excerpt of record page 440 and supplemental excerpt of record pages 121 and 122 refer to officers. Sure. Because there were other – there were normal central district blue coats in the  And, but anyway, never mind that. We know – I know what the record shows. You just said – you just said that the Supreme Court and we have both held that the presence of an armed guard is – what's the word you used? Well, this – Inherently prejudicial? That's right. Okay. So where do you see that in Holbrook? Holbrook's – in Holbrook, there were armed – there were, as a robbery prosecution, there were four uniformed armed guards seated in the front row. And the Supreme Court said, eh, in today's world, jurors, public, everybody is used to seeing armed guards, not inherently prejudicial. The difference between Holbrook is that there the Supreme Court noted the armed guard was not next to the defendant but in the front row, so everyone could perceive that the armed guard was there for general security. The armed guard being next to Mr. Lopez clearly created a negative implication. Your Honor, all we're saying here in terms of abusive discretion is the trial judge should ask two questions. First, was there reason to believe that Mr. Lopez was a threat to safety? And second, were there measures that could have been done that were less prejudicial to ensure the safety of the courtroom? What hasn't been mentioned here is Mr. Lopez was already in shackles in the courtroom at all times. There was no time Mr. Lopez was in shackles in the courtroom during this. The shackles were covered. He was shackled when he testified, and the jury was brought in afterwards. I mean, he was seated, and the jury was brought in afterwards. There is absolutely no, I shouldn't say that. I do not believe that there is any indication in the record that he was shackled otherwise when the jury was present. Am I incorrect in that? My understanding, and I will both confirm with trial counsel and check the record, that he was shackled at all times while he was in the courtroom. But I will check on that. I have trial counsel here with me today. Well, we'll need the record. I will get the record citation on that point. But the question is, were there alternatives less prejudicial to the jury that could have been used exactly like that which was done in Holbrook v. Flanders? I'm not aware of any rule that says that in a civil case or, for that matter, a criminal case, the judge has to choose the least restrictive alternative for securing the courtroom. Frankly, I'm surprised this is the focus at all. I thought the focus of the arguments was going to be on whether the judge improperly instead of asking the corrections people what the story was and then letting the defense counsel ask them. Well, you just asked me two things. First, case law, if you look at Wilson v. McCarthy, this Court said that shackling a defendant is a matter of last resort, and there are cases that analogize a guard nearing by to being the same as shackled. Well, first of all, he's not a defendant. He's a plaintiff. Second, the shackling is invisible to the jury, so it can't possibly prejudice him. And third, the shackling, as far as the record shows, is only when he's at the witness stand and not the rest of the time, as far as I could tell. Let me take those one at a time. This Court has said that the same principles apply in civil cases as in criminal cases. That's Tyers v. Finner. Also, there are cases that say having an armed guard next to a party is just as prejudicial as having the person shackled. Kennedy v. Cardwell from the Sixth Circuit is an example of that. And finally, in terms of the deference to the Department of Corrections, that's exactly the point I made, that the first question the judge should have asked is, is there any basis with regard to the safety of the courtroom that would require this? And catecholically, with regard from the Department of Corrections, the judge knew that he was serving a very long-term prison sentence, and he's a State prisoner, and the judge made it very clear in express language that he understood, he, the judge understood that it was his decision about what kind of security measures would take place in his courtroom. It was not a decision for the Department of Corrections people to make. He made that very, very clear. But, Your Honor, at no point did he ask the Department of Corrections officer, why is there reason to believe this person is dangerous? If that completes 501 and 502 of the record. If a State prisoner has got a long-term prison sentence, you would never have someone who is in custody, a long-term prison sentence, in a Federal courtroom without security. You Honor, the question here was, was there any inquiry to believe that with the long prison sentence there's a threat, and was there some way less prejudicial to handle this? Let me shift to the second issue, because it's an independent issue. And just as the Court undermined the credibility of the plaintiff, so did it err in not making minimal factual findings as to why it excluded the prior shooting of Tommy Thompson. This is a clear case under Rule 404B. There's not closer evidence in terms of similarity than what the plaintiff's wanted to introduce. There's a prior shooting in almost exactly the same circumstances. This Court has articulated a four-part test. Well, there's one really, really big difference in circumstance, and that is in the prior – well, never mind the fact that he was exonerated. And never mind the fact that the – there's no substantial evidence that any of this occurred. But taking the police report at face value, he was shooting from the back of the car because the car was driving toward two other law enforcement officers whose lives he believed were in jeopardy by the speeding car going right at him. That's quite different. But, Your Honor, if the trial judge would have said that, then there would be a basis for appellate review. It's clear from the record. I mean, I just read it. I know I can tell that. It's clear from the arguments that the parties made. And that's a perfectly – an appellate review proper to look at what the parties argued, what the judge decided, and put two and two together. I disagree, Your Honor. If you look at page 432 of the excerpt of records, the judge granted the defendant's motion in limine without any explanation whatsoever. Now, perhaps the judge was saying, as you are, that the instances were too dissimilar. Or perhaps the judge was making an implicit ruling under Rule 403 that the prejudicial value outweighed the probative value. But the judge never explained that. Counsel, I am perhaps more sympathetic with the argument you make about the judges not explaining it and possibly the non-obviousness. But I'm reading 404B. I can see where the prior shootings prove that this cop is kind of a cowboy. I do not understand how the prior shootings prove mode of opportunity, intent, preparation plan, knowledge, identity, or absence of mistake or accident. Well, I think they go to especially intent and also the absence of mistake and accident. Because the question here is, was it an intentional act by the officer to shoot at the car after it had gone past him? Or was it just an accident? In his testimony, the car was coming directly at him. The fact that he had done this previously does go to whether or not it was intentional, and it goes to whether or not it was a mistake or an accident. Well, he's allowed to shoot intentionally if the car is coming at him and he fears death or serious injury to himself or other officers. So I don't really see why it proves any intent that's at issue. But he's not allowed to shoot with the intent to cause harm. He's allowed to shoot with the intent to kill somebody who's trying to kill him. Absolutely that's right. But if the car had already gone past him, then there would be no basis for his firing that shot. Well, the passenger said the car was going really, really fast. It takes time to pull a trigger. It's not instantaneous. That's exactly our point. In fact, we would suggest that the facts in the record show that Miguel Lopez's story was the credible one and the officer's story wasn't credible. And here you can look at the record in terms of the angle of the shot. How do you work it on something like this? Generally, once you have a jury verdict, you take all the facts in support of the verdict, which means believing what the passengers told the cops, not what they told the jury, and believing the cops' testimony, not Lopez's. Does that apply in evaluating this for abuse of discretion, this evidentiary decision? Yes, Your Honor. I think when you look at the evidence in this case, it's a very close case, which is why I started by saying it so comes to the credibility of these witnesses. And it's the rulings of this judge without factual findings that so likely determine the outcome of the case because it so enhanced the credibility of one witness and undermined that of the other. With your permission, I'd like to save the rest of my time for rebuttal. Sure. Good morning, Your Honors. Glyde Bach on behalf of the City of Los Angeles Appellees. Counsel, there were a couple of things about your side of the case that really bothered me. Okay. In that colloquy about the security, when the defense lawyer said, was explaining the details of the person's prison classification and saying it's not a security risk and couldn't we just hear from the Department of Corrections, the judge said, I don't have the time. And I thought, boy, a two-week trial and you can't spare ten minutes to see if you're going to be wasting two weeks of the jury's time and everybody else's. It seems like it's nothing to just put the DOC guy on the stand and ask him, is this fellow a threat? And then the other thing that really bothered me is the judge kept going on about the threat to the ladies, the threat to the women. And although Lopez had by this time killed I think three people in two driving incidents, this one and another, they're all male, there was no history of assaultive conduct against women. As long as the guy didn't have a car and a bottle of whiskey in the courtroom, I don't understand what the security problem was. Well, I remember that comment by the judge, and when the judge made that comment about not having time, you have to remember he had already spent by my count almost 60 pages of the transcript discussing this issue. So why did he spend all that time talking with the lawyers instead of some time listening to the DOC person saying whether there's a risk of flight or assault? Because the time he spent with the lawyers was trying to figure out a way that he could set up the courtroom so that there would be no prejudice at all and that the jury wouldn't even know that Lopez was in custody. All that discussion was about, just as Judge Reimer has pointed out, this was a man that was serving a 15-year sentence. He was in plain clothes. He was unshackled. Look, we've got this case called Lemons that says the judge cannot delegate the issue of restraints to officials of, I can't remember if it was corrections or police in that case. He can't delegate it. He has to ascertain for himself whether there is, in fact, a security problem that requires restraints of some kind. And it seems like the judge just didn't do it and wouldn't do it despite a reasonable request, and it wouldn't have taken a significant amount of time. But remember, in Lemons v. Skidmore, we had a defendant who was bound, gagged, handcuffed, and shackled. It's a lot different than what we have here. We have a felon serving a 15-year sentence, and it's true, it was for a drunk driving and negligent driving offense, but it still was a manslaughter charge. He is in plain clothes. He is surrounded by his friends and family. He's in a public courtroom. He has no shackles or handcuffs on. Without some modicum of security, we're effectively releasing him from prison simply because he filed a lawsuit. There's got to be some security in the courtroom. And this is, I believe, one of the final security problems. And I don't see why you wouldn't ask the DOC person. Now, maybe the judge had talked to him in chambers, but that strikes me as a problem rather than a solution, because you're not supposed to do that kind of thing ex parte. Well, you're saying there's a lot of ways to do it, but what is absent from the record is any alternative offered by the Plaintiffs' Council. My understanding is that on the first day of trial, when the corrections officer brought Lopez to court, there was a discussion about security. There was an extensive discussion. With the corrections officer. Correct, absolutely. Now, it's true he didn't have a full-blown evidentiary hearing where witnesses were sworn, but he spent extensive time, much more time than I have seen in any kind of a trial with this sort of security issue. And what we also do not see in the record is any evidence that the jury actually did know that he was in custody. It was incumbent upon the plaintiffs. If they wanted to make this issue on appeal, they needed to make some kind of motion for new trial, some kind of evidence that the jury knew that he was in custody. Well, yes, I would assume that the prejudice doesn't just come from an inference that he's in custody. A worse inference would be that he's dangerous, and so dangerous that he needs to have an armed guard, and that feeds the theory that he was driving dangerously, so dangerously as to, you know, the hazard. Potentially, but I think in this case we need to really look, step back, and look at some of the core appellate principles, which is what you just mentioned of prejudice. Potentially there was that issue, but we have to step back and look at what we're dealing with. We have Lopez, who, if there were no guards in the courtroom at all, this is a man who testified he had a few sips of beer. In fact, he had a blood alcohol limit far above the legal limit. He said he was driving slowly. His own passenger said he was driving crazy. He seemed to be on drugs. We were trying to get him to calm down. We're trying to get him to slow down. He said the officer shot him in the eye. Do you have any more to say about the geography of the courtroom and the security setup? I had envisioned in my mind when I read the record what I was used to when I tried cases, which was the plaintiffs sit with their lawyers at the counsel table, except for this guy, Lopez, who sits back in the spectator section in an empty row with an armed guard or two sitting next to him. But I gather now that's not the way it was. Is that right? Judge Reimer was absolutely correct that he was given a choice. I don't think you heard my question. Well, let me ask simpler questions. Is it true that none of the plaintiffs were sitting at counsel table with their lawyers? Of course, all of the plaintiffs were sitting in the spectator section behind the bar. Let me tell you the way it worked out in the trial. And this is not on the record. This is just from my conversations with the trial attorney. And the way it worked out was that Lopez, given the choice of counsel table or spectator seats, chose the spectator seats. And his family and the other plaintiffs were also in the spectator seats. My understanding is that they ended up sitting in different quadrants of the courtroom. Lopez was in the center, and I think that the other plaintiffs were on the side. Were the other plaintiffs sitting at counsel table, or were they sitting behind the bar? No, they were sitting on the spectator seats. They were sitting behind the bar in the spectator seats. Another thing I wanted to know is I was kind of puzzled about the judge's comments, I don't have the time and all the stuff about assault on women. Did this trial happen to happen right after that Georgia case where the criminal grabbed the security guard's gun and killed people on the way out of the courthouse? That I'm not sure of, but again, something I learned from the trial attorney, and again, it's not on the record, but that the particular configuration of the courtroom was such that if Lopez was sitting, was not sitting at whether it's I'm having a real problem here. I ask a question and you talk about something else, so I'm left in the dark about my question. I'm still thinking about my question while you're talking, so I'm not paying enough attention to your answer. My answer to your question is what I just said. My answer to your question is I don't know if it was near that time in the past of that case. But what I think is a related issue on this is that the particular configuration of the courtroom was such that if Lopez was sitting either at counsel table, or in that front row in the spectator seats, he would be either right next to the court reporter, or right next to opposing counsel, and apparently that was a big reason for the trial court's, the district court's concern. But again, I think we really need to remember that the issue here is the record, and I think that if we look at the record, I want to give you guys the sites for Lopez being unshackled and in plain clothes, as Judge Reimer pointed out, and that's at the supplemental excerpts of the record, page 44. And there the court was very clear, saying he can be in plain clothes, and he doesn't have to be shackled or handcuffed. Could you also give us the site to where the Department of Corrections officers explained on the record what the security problem was? That was early on, and I need a minute for that. It's the first day in about five or six pages. Right, I believe that that was... This is in the reporter's transcript for August 16, 2006, for the motions eliminating. I'm sorry, this is about delivery of Lopez to the court. Let's see. I just looked at SCR. It's 44. I'm not sure I see what it was that you were referring to there. Let's see, at line... Okay, 44 at line 12 to 17, where plaintiff's counsel, Judge Reimer, asked, we wanted to address the court's procedures in reference to having our client, Mr. Lopez, be dressed in civilian clothing, and the court says, I have no objection to that, provide the clothing. And the plaintiff's counsel says, I'm not shackled, Your Honor. And the court says, yes, that's the court's intention. The court then says, unless I'm informed that there's some security issue, generally I don't require the shackling. Okay, and now the other one. The other one, I think I'm going to need to supplement if it's okay with the court. It's in the first day, and there's a conversation between the judge and the corrections officer when he brings Lopez into the courtroom, and they talk about it. It's rather unspecific, but the corrections officer does say that there is, you know, he's responsible for Lopez and for general security. But the point is, he was there, and the conversation could have taken place in any respect that anybody wished to take it, and it is what it is, right? Right, and that is my memory, too, of how the exchange came down. I'm just having trouble finding the exact page citation. And again, I can supplement if you would like with the letter. But I think also we need to also step back with this and really remember that this might have been an issue, an issue that the judge potentially was even struggling with, but really we need to look back and see what, if it would have impacted the outcome of the trial, if it really would have fed into the jury's deliberations. This is a unanimous verdict. I mean, as the appellant's counsel has just said, the whole issue here was credibility. And I think far and wide. Well, I think his point is that it was a screaming match between two people, basically, between Lopez and Thompson. And by virtue of what the judge did, he tied Lopez's hands by not allowing in any of the prior incidents which would have messed Thompson up, made him look bad, and took an affirmative step to make Lopez look bad by having him always under the wing of an armed guard from which the jury could infer that he is a very bad guy indeed. So the argument is that created an insoluble prejudice problem. Well, but if you look at the actual issues that the jury had to decide, it wasn't, I mean, honestly, in many ways the shooting issue was a side issue and that the ultimate way that the unfortunate and tragic accident happened was when Lopez was shot. Well, it may be a side issue, but the issue was they told wildly divergent stories about what happened, not just the question about where the shooting happened, but the whole way it went down. Thompson told one story. Lopez told another story. So the argument is the credibility of each was the ballgame. Correct, but if there were something in the record that would show that some kind of corroboration at all of Lopez's account of what happened, you could potentially say that this issue that, you know, him being in custody somehow played into the jury's deliberations. But here, really, literally, there's nothing that Lopez ---- Somehow it announces this is a really dangerous, scary guy while hiding from the jury the fact that the cop is a cowboy. Couldn't be clearer. I don't believe that the prior shootings ---- The only question is whether it's justified under the law. But the prior shootings, I don't agree with that description then. It shows that he's a cowboy. He was exonerated in those prior shootings, for one thing. A lot of police go through their whole 20 years without drawing their gun. But there's got to be something on the record to show that in some ---- I mean, if you look at the cases that they cited, there's the one where there's the criminal case that the police officer unleashed dogs on African-American suspects. That was a pattern that was shown. That was something that she had clearly done it before. There were lots of prior incidents. In that case, the court said, yeah, that would show a propensity to do that now in this criminal case in which she had done it and injured the victim. But in this case, you really don't have any overlap, other than the fact that it happens to be a moving car. The circumstances are completely different. But if you look at the competing sides of the evidence, virtually nothing that Lopez said was corroborated by anybody, including his fellow plaintiffs. The statements that they made the night of the injury were completely consistent with the police officer's account of what happened that night. Unless the jury chose to believe what they said at trial instead of what they said to the police when they got caught. But they were severely impeached at trial. I think, as I'm saying again, is that it's not like there's some body of evidence out there that would have otherwise supported Lopez's version of the facts. Could you tell me, incidentally, there are many circumstances where once there's a verdict, we take all the facts most favorably to the verdict. Do we do that here? Absolutely, especially here where we have a unanimous jury verdict. I think unanimous ones are the only kind you get in federal court, I think. And the other comment to be made is that... So that doesn't really... Is there a law that tells us that when we evaluate the questions before us, we're supposed to do that? To give deference to the verdict? Absolutely. And what law is that? Well, I believe it was in your brief. I don't remember. That's why I asked. I thought you'd remember. If you have to look it up, forget it, because I can look at the brief again myself. I just thought you'd remember your cases. That's my memory. I know I do not have the cases off the top of my head. But, yes, just the basic prejudicial error rule is giving deference to jury verdicts. Such as this. When you have the competing versions and it all rests upon credibility, that's a very traditional area for the jury to decide. Does the Court have any further questions? Thank you. My central point is that there was abusive discretion in not making minimal factual findings as to key issues. On the first question, the judge should have asked two questions. First, was there reason to believe that this person was a threat to safety? The judge never asked that question of the corrections officer. Was there a colloquy on the first day? Well, there was a colloquy, but the judge said, But, no, there was never a colloquy where he asked the corrections officers, why do you believe he's a danger? That's what I'm trying to find out. Right. And if you look here, Your Honor, especially at pages 237 of the executor records and then pages 501 and 502 of the executor records, there's a lot of discussion about the fact that he'd been transferred from one facility to another. And then when the attorneys for the plaintiffs said, ask the security officer, and the judge said on page 502, I don't have time to do that. He said, I'm not going to question the classification of the security officer. But never was a question asked of the security officer. You're taking just minutes. Why do you believe he's dangerous? He wasn't asked of the security officer at the beginning of the case either? There's no place in the record they ever asked him, why do you believe he's dangerous, other than the fact of the prior conviction for the nonviolent offense. Nor was there ever a question as to were there other alternatives that could have been used, like as I said to Judge Reimer, in Holbrook v. Flynn, that would have been less prejudicial. Could you also talk about prejudice a little? It seemed like in view of what the passengers told the police the night of the events and Lopez's story, which sure looked like lies, that there was no prejudice. Why was there prejudice? Your Honor, I think that here the attorney for the defendants is really misstating a lot of what's in the record. In terms of the statements, you're right as to the statements made to the police. Those right after the accident, there's reason to believe they were in shock. They also testified on the witness stand, so there's a good deal of evidence to corroborate what Mr. Lopez said. Let me give you again the excerpts of record citations. Testimony on pages 520 to 522, 535, 610 to 612, 622, 623, 629, all corroborating Mr. Lopez's statements. I know that, and I know you're right. However, it seems it's hard for me to understand why being in shock would cause the passengers to tell the police he was driving extremely fast. I can't remember if they said 80 or 100 miles an hour. It's hard to see why being in shock would do that, and it's easy to see why the prospect of recovering large amounts of money would lead them to say he was driving just fine and the officer was the one acting like a maniac. And, of course, they deny having made those statements when they're on the witness stand. My point here is something that Judge Reimer said, that the evidence was closely matched. There was ballistics to suggest that Officer Thompson had fired backwards at the car after it had already passed. That just impressed me much less than you. I mean, if you're shooting with a revolver, it takes a certain amount of time to make the decision to pull and then to pull the trigger. I think usually they figure a half second of reaction time, but even assuming it's a tenth of a second, because you're doing it as fast as you can in a panic, the car is still going to pass you. Absolutely. But my point here is, Your Honor, that given that ballistics could be interpreted either way, given that the witness statements could be interpreted either way, this really did come down to the credibility of two witnesses. Also, I can't see why it would matter that he's shooting at the back of the car if the jury thinks the car was, that he thought that the car was headed straight toward the other police. Well, the question is, was the car headed directly to the police? No, no, it isn't. It's just, did he think so? Right. Well, you're absolutely right. The question is, did he think so? But was there reasonable grounds, objectively reasonable grounds at the time? And if you buy Miguel Lopez's story, then Officer Thompson was not telling the truth and there was no danger to him. If you buy Officer Thompson's statement, it was objectively reasonable. That's why this came down so much to credibility, and that's why the judge should have had the minimal hearing as to was it necessary to have an armed guard next to Miguel Lopez, and the judge should have given some explanation for why the requirements for 404B were not met, given 404B seems on point, and the judge gave absolutely no reasons whatsoever. Oh, I have one more question I want to ask you, just like I asked your opposing counsel. Did this happen, this trial happen right after that Desperado in Georgia took the correction officer's gun, killed a bunch of people as he escaped from the courthouse and subsequently? I know this trial occurred in 2006. I don't remember when the incident occurred in Georgia. Thank you. Thank you, both of you. The matter just argued will be submitted, and the court will stand at recess. All rise.
judges: Fernandez, Rymer, Kleinfeld